## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOE J. BALTAS,                          :
    Petitioner,                    :
                         :
    v.                             :            Case No. 3:22-cv-571 (VAB)
                         :
COMMISSIONER OF CORRECTION,             :
    Respondent.                    :

### RULING AND ORDER

Joe J. Baltas ("Petitioner"), currently incarcerated under High Security in Cranston,

Rhode Island, has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254

challenging his conviction for murder and assault.

The Commissioner of Correction ("Respondent") has filed a response to the order to

show cause seeking denial of the petition.

For the following reasons, the petition is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

The Connecticut Supreme Court determined the jury reasonably could have found the

following facts.

> [Mr. Baltas] was involved in a relationship with [Misty] Rock, one of the
> complaining witnesses in this case, from December, 2005 until October, 2006. At
> some point during the month of October, the two discussed leaving Meriden, the
> town in which both of them lived, to start a new life in South Carolina.
>
> On October 25, 2006, Rock was living with her brother, Christopher Laverty
> (Christopher), her mother Linda Laverty (Linda), and her stepfather, Michael
> Laverty (Michael). At approximately 10 p.m., Linda and Michael were sitting in
> the living room of their apartment watching a movie, while Christopher and Rock
> were on the second floor of the home. Christopher came downstairs and opened the

door to the basement, intending to check on the status of a load of laundry. As he opened the basement door, he encountered a masked person who was dressed all in black, wearing a ski mask, and holding at least one knife. The masked person stabbed Christopher in the stomach, and then moved out of the basement and into the living room, where he proceeded to fatally stab Michael. The masked person then turned to Linda, stated "die, bitch," and stabbed her in the neck. Linda later testified that she recognized the masked person as [Mr. Baltas] because of his eyes, the sound of his voice, and his body mannerisms. The masked person walked to the staircase leading to the upper floor of the home, and while on the staircase, he ran into Rock, who had heard the commotion from upstairs. In the collision, the masked person's knife went through Rock's sweatshirt and t-shirt and inflicted a scratch on her stomach. The masked person then forced Rock in front of him, grabbed her by the hair, and forced her out of the apartment. While this was happening, Christopher grabbed a knife from the kitchen and a telephone and exited the home, running next door to ask a neighbor to call the police. Rock and the masked person then exited the apartment and were walking down the street, away from the apartment. Christopher attempted to stop them, and Rock told him to stop and not come any closer. Christopher then sat down on a bench and called the police himself, identifying [Mr. Baltas] as the masked person who had just assaulted his family.

 [Mr. Baltas] and Rock then walked to an abandoned car and sat in it. Rock testified that, at this point, [Mr. Baltas] told her that he had killed Michael and stabbed Linda and, although Rock could not remember if [Mr. Baltas] was still wearing a mask, Rock recognized his voice. [Mr. Baltas] and Rock waited in the car until Rock informed [Mr. Baltas] that she needed to use the bathroom. [Mr. Baltas] led Rock to the Pulaski School, at which point [Mr. Baltas]—who at that time was not wearing a ski mask or a dark shirt—and Rock were confronted by police officers. The police observed [Mr. Baltas] holding a butter knife in his hand and told him to drop it. When [Mr. Baltas] did not comply with their command, the police tasered him and he fell to the ground; as he did so, a folding knife later found to be stained with Michael's blood fell out of [Mr. Baltas'] pocket.

A K-9 officer was also dispatched as a result of Christopher's 911 call, and the officer's dog tracked the path that [Mr. Baltas] and Rock took away from the apartment. The K-9 officer also had his dog perform an "article recovery...." Between the K-9 officer's search and the actions of other police officers in the area, the following items along the path taken by [Mr. Baltas] and Rock were recovered that evening: (1) a ski mask, the interior of which later was tested positive for [Mr. Baltas'] DNA, and the exterior of which tested positive for Michael's blood; (2) a dark, bloody shirt which tested positive for the blood of Linda and Michael; (3) a latex glove stained with the blood of Linda and also possibly of Michael; and (4) a long knife stained with the blood of Michael, which the state medical examiner later concluded was the weapon that caused his fatal wounds. Tests also indicated that Michael and Linda were the sources of various bloodstains found on [Mr. Baltas']

pants, sneaker, and arms when he was arrested. Finally, the police matched a shoe print that was formed in blood at the crime scene to the shoe of [Mr. Baltas].

*State v. Baltas*, 311 Conn. 786, 790-92 (2014).

### B. Procedural Background

In 2010, following a criminal trial, a jury convicted Mr. Baltas of murder, assault, burglary, and kidnapping. *Baltas*, 311 Conn. at 789. On direct appeal, the Connecticut Supreme Court overturned the convictions for burglary and kidnapping but affirmed the convictions for murder and assault. *Id.* at 790. Although the case was remanded for a new trial on the burglary and kidnapping charges, the State of Connecticut (the "State") chose not to retry Mr. Baltas on those charges. Mr. Baltas remains incarcerated on the murder and assault convictions.

On direct appeal, Mr. Baltas challenged his conviction on four grounds: (1) the trial court improperly excluded evidence highly relevant to his defense thereby preventing him from engaging in cross-examination regarding that evidence, (2) the trial court failed to give a hybrid third-party culpability instruction or failed to instruct the jury on Mr. Baltas' theory of defense, (3) the trial court refused to instruct the jury regarding the motive of one complaining witness to testify falsely, and (4) the trial court refused to reverse the convictions which were tainted by improper comments by the prosecutor. *Id.* at 789–90.

On September 8, 2015, Mr. Baltas filed a petition for writ of habeas corpus in state court. In the amended petition, Mr. Baltas asserted claims of prosecutorial misconduct, police misconduct, judicial misconduct, and ineffective assistance of trial counsel. *Baltas v. Commissioner of Corr.*, No. CV154007469, 2020 WL 1745684, at *2 (Conn. Super. Ct. Feb. 25, 2020). The state court denied the petition. The court determined that the claims of prosecutorial misconduct were procedurally defaulted and barred by res judicata, and the claims of police

misconduct were barred by res judicata and failed to state a cognizable claim. *Id.* at *3–4. Mr. Baltas asserted several examples of ineffective assistance of counsel. He claimed that trial counsel offered a "two person" theory at closing without first consulting him, agreed to the admission of certain exhibits without first reviewing them, failed to properly impeach certain witnesses, failed to call certain witnesses to testify for the defense, failed to consult or hire experts in blood spatter or crime scene reconstruction, failed to impeach Misty Rock with letters she had written, and failed to conduct an adequate investigation. *Id.* at *5. The state court rejected all claims. *Id.* at *5–8. The court also denied certification to appeal. *Id.* at *9.

Mr. Baltas appealed the denial of certification. He argued that the habeas court erred in determining that his right of autonomy was not violated when counsel allegedly conceded his guilt during closing argument and in determining that counsel was not ineffective in making that argument. *Baltas v. Commissioner of Corr.*, 210 Conn. App. 167, 173 (Conn. App. 2022). The Connecticut Appellate Court dismissed the appeal, and, on March 1, 2022, the Connecticut Supreme Court denied certification to appeal. *Id*. at 176, *cert. denied*, 342 Conn. 911 (2022).

On April 18, 2022, Mr. Baltas commenced this action by petition asserting six grounds for relief: (1) violation of his Sixth Amendment right to autonomy, (2) actual innocence, (3) ineffective assistance of trial counsel; (4) police misconduct, (5) prosecutorial misconduct, (6) state court error and abuse of discretion, and (7) cumulative error. *See* Pet., ECF No. 1, at 122–39.

Respondent filed a motion to dismiss arguing that Mr. Baltas failed to exhaust his state court remedies on most of the claims asserted in the petition and that other claims were not cognizable in a federal habeas petition. On December16, 2022, the Court granted the motion to

dismiss and dismissed the petition without prejudice to Mr. Baltas filing an amended petition asserting only the claims for which he had exhausted his state court remedies. *See* Ruling and Order, ECF No. 34. The Court cautioned Mr. Baltas that, if he chose to pursue only the exhausted claims rather than returning to state court to properly exhaust the remaining claim, he might be precluded from obtaining federal review of the unexhausted claims. *See id.* at 18–19.

On May 15, 2023, Mr. Baltas filed an amended petition asserting six grounds: (1) violation of his Sixth Amendment right to autonomy, (2) actual innocence, (3) ineffective assistance of trial counsel, (4) prosecutorial misconduct, (5) state court error and abuse of discretion, and (6) cumulative error. *See* Am. Pet., ECF No. 48, at 24–36.

## II.    STANDARD OF REVIEW

The federal court will entertain a petition for writ of habeas corpus challenging a state court conviction only if the petitioner claims that his custody violates the Constitution or federal laws. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam)) (internal quotation marks omitted).

As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a claim will be considered "adjudicated on the merits" even if the state court fails to mention the federal claim and cites no relevant federal case law. *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001); *accord Harrington v Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it

may be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary."); *id.* at 98 (section 2254(d)

deference applies even "[w]here a state court's decision is unaccompanied by an explanation").

Thus, a court must "extend considerable deference even to deficient reasoning, at least in the

absence of an analysis so flawed as to undermine confidence that the constitutional claim has

been fairly adjudicated." *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022) (citation and

punctuation omitted).

  The federal court cannot grant a petition for a writ of habeas corpus filed by a person in

state custody with regard to any claim that was rejected on the merits by the state court unless the

adjudication of the claim in state court either:

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application
> of, clearly established Federal law, as determined by the Supreme Court of the United
> States; or
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in
> light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The federal law defined by the Supreme Court "may be either a generalized

standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a

standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir.), *cert. denied*, 537

U.S. 909 (2002). Clearly established federal law is found in holdings, not dicta, of the Supreme

Court at the time of the state court decision. *White v. Woodall*, 572 U.S. 415, 419 (2014). Second

Circuit law which does not have a counterpart in Supreme Court jurisprudence cannot provide a

basis for federal habeas relief. *See Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (circuit

precedent, even if "merely reflect[ing]" Supreme Court precedent, does not constitute "clearly

established federal law" for purposes of § 2254(d)(1)); *Renico v. Lett,* 559 U.S. 766, 778 (2010)

(holding that court of appeals erred in relying on its own decision in federal habeas action); *see also Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (absent a Supreme Court case establishing a particular right, federal court inference of right does not warrant federal habeas relief).

A decision is "contrary to" clearly established federal law where the state court applies a rule different from that set forth by the Supreme Court or if it decides a case differently than the Supreme Court on essentially the same facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court unreasonably applies Supreme Court law when the court has correctly identified the governing law, but unreasonably applies that law to the facts of the case. The state court decision must be more than incorrect; it must be "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quoting *Harrington*, 562 U.S. at 103); *see also Burt v. Titlow*, 571 U.S. 12, 20 (2013) (federal habeas relief warranted only where the state criminal justice system has experienced an "extreme malfunction"); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (objective unreasonableness is "a substantially higher threshold" than incorrectness). Even clear error will not establish an unreasonable application of Supreme Court law. *LeBlanc,* 582 U.S. at 94 (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (*per curiam*)).

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009). "The more general the rule the more leeway courts have in reaching outcomes in case-by-case determinations" as the application of a general standard to a specific case "can demand a substantial element of judgment." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

7

Thus, "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Woods*, 575 U.S. at 318 (citation, brackets, and internal quotation marks omitted). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 562 U.S. at 101 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "[I]t is the habeas applicant's burden to show that the state court applied [Federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (*per curiam*); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof.").

When reviewing a habeas petition, the Court presumes that the factual determinations of the state court are correct. The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013) (standard for evaluating state court rulings where constitutional claims have been considered on the merits and which affords state court rulings the benefit of the doubt is highly deferential and difficult for petitioner to meet and was intended to be so).

The presumption of correctness, which applies to "historical facts, that is, recitals of external events and the credibility of the witnesses narrating them[,]" will be overturned only if the material facts were not adequately developed by the state court or if the factual determination is not adequately supported by the record. *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999) (internal quotation marks and citation omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Donald*,

575 U.S. at 316; *see also Brumfield v. Cain*, 576 U.S. 305, 314 (2015) ("If [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination.") (internal quotation marks and citation omitted).

In addition, the federal court's review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 180; *see also Holland v. Jackson*, 542 U.S. 649, 652 (2004) ("Whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."). Because collateral review of a conviction applies a different standard than the direct appeal, an error that may have supported reversal on direct appeal will not necessarily be sufficient to grant a habeas petition. *Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993).

## III.    DISCUSSION

Respondent contends that the petition must be denied because the state courts did not contravene or unreasonably apply clearly established federal law. Respondent further argues that several of Mr. Baltas' claims are not cognizable in a federal habeas petition and that several of his subclaims remain unexhausted. Mr. Baltas opposes the Respondent's arguments and, in his reply brief, also argues that the facts the Connecticut Supreme Court determined were reasonably found by the jury are unreasonable in light of the evidence presented at trial.

### A.  Petitioner's Challenge to Recitation of Facts

Mr. Baltas first contends that the Connecticut Supreme Court's recitation of facts that could reasonably have been found by the jury are unreasonable in light of the evidence of record. This was not included as a ground in the amended petition. And Mr. Baltas cannot amend his

habeas petition in his reply brief. *See Mourning v. Commissioner of Corr*., No. 3:14-cv-845(VAB), 2016 WL 5955518, at *7 (D. Conn. Oct. 16, 2016) (citation omitted); *see also Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (district court cannot consider new claims asserted in opposition to motion to dismiss).

Accordingly, the Court does not consider this claim.

## B. Ground One—Sixth Amendment Right to Autonomy

In *McCoy v. Louisiana*, 584 U.S. 414 (2018), the Supreme Court held that a criminal defendant "has the right [under the Sixth Amendment] to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id*. at 417. Mr. Baltas relies on *McCoy* to support his claim.

Mr. Baltas argues that counsel violated his Sixth Amendment right to autonomy by disregarding Mr. Baltas' theory of defense, namely, that he was innocent and another person, Misty Rock, committed the murder and assaults. Mr. Baltas states that, at no time did he agree to a "two assailant" theory of the crimes. However, despite his lack of agreement, counsel advanced this theory in closing argument. ECF No. 48 at 24–26.[1]

The Connecticut Supreme Court issued its ruling on Mr. Baltas' direct appeal on June 3, 2014. The Supreme Court decided *McCoy* in 2018, four years later. Thus, the right recognized in *McCoy* is applicable only if the decision is retroactively applied to cases on collateral review. As the Supreme Court heard *McCoy* on direct appeal, the Court did not make any determination

---

[1] The page numbers cited in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the document and not to the pager numbers on the original documents, if any.

about the retroactivity of the decision. Nor has the Court held that *McCoy* is retroactive in any subsequent decision.

"The Supreme Court has described two categories of cases previously held to be retroactive: new substantive rules that place 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe'; and new procedural rules that 'are implicit in the concept of ordered liberty.'" *Herrera-Gomez v. United States*, 755 F.3d 142, 146 (2d Cir. 2014) (quoting *Teague v. Lane*, 489 U.S. 288, 311 (1989)). The first category is inapplicable because *McCoy* did not involve private conduct. The second category involves "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding"; "infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Tyler v. Cain*, 533 U.S. 656, 665 (2001) (internal quotation marks and citations omitted).

The Supreme Court recently reviewed the second category. In *Edwards v. Vannoy*, 593 U.S. 255 (2021), the Supreme Court noted that it has found retroactivity in only one case, *Gideon v. Wainwright*, 372 U.S. 335 (1963), and, in the thirty-two years since *Teague* was decided, it has not found one new procedural rule to be retroactive.[2] *Id.* at 267–68. The Supreme Court held that "[n]ew procedural rules do not apply retroactively on federal collateral review." *Id.* at 272. Applying this holding, two Courts of Appeal have concluded that *McCoy* did not establish a

---

[2] The Court noted that even watershed rulings such as *Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring police to inform individuals of their constitutional rights before questioning them), *Duncan v. Louisiana*, 391 U.S. 145 (1968) (constitutional right to jury trial in state criminal case), and *Batson v. Kentucky*, 476 U.S. 79 (1986) (prosecutors may not discriminate on the basis of race when exercising peremptory challenges) were not retroactive.

watershed rule and was not retroactive. *See Smith v. Stein*, 982 F.3d 229, 234-45 (4th Cir. 2020); *Christian v. Thomas*, 982 F.3d 1215, 1223–25 (9th Cir. 2020).

Thus, as the Supreme Court has not determined that the procedural rule announced in *McCoy* is retroactive, it is unavailable on federal collateral review. *See Santiago-Ortiz v. United States*, No. 17-CR-0149(LAK), 2023 WL 3740228, at *4 n.32 (S.D.N.Y. May 23, 2023) (citing cases).

Accordingly, the petition for writ of habeas corpus is denied on this ground.

C. **Ground Two—Actual Innocence**

As the Court previously stated in ruling on Respondent's motion to dismiss, federal law does not recognize a freestanding claim for actual innocence. *Herrera v. Collins*, 506 U.S. 390, 400–01 (1993) (federal court on habeas review does not revisit state court determination of guilt).

Mr. Baltas again, however, claims that he is factually innocent of the crimes. ECF No. 48 at 26–30. In his reply brief, Mr. Baltas incorrectly states that the Court permitted the actual innocence claim to proceed "for later consideration." ECF No. 63 at 10. The Court actually dismissed this count of the original petition. ECF No. 34 at 10. The Court explained that allegations of actual innocence may be used to excuse procedural default but noted that any argument the Mr. Baltas was actually innocent was premature because there had been no determination that Mr. Baltas had procedurally defaulted on any claim. *Id.* As Respondent has not argued that Mr. Baltas has procedurally defaulted on any claim in the amended petition, consideration of whether Mr. Baltas is actually innocent is not required.

Accordingly, ground two does not state a cognizable claim and the petition is denied on a

stand-alone ground of actual innocence.

### D.  Ground Three—Ineffective Assistance of Counsel

The standard for a claim of ineffective assistance of counsel, when denied on the merits by a state court, is well-established:

> To succeed on a claim of ineffective assistance of counsel in violation of the Sixth Amendment ... a defendant must demonstrate (1) that his attorney's performance "fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)) (internal citations omitted). Under the AEDPA, federal courts must grant state courts substantial "deference and latitude" when considering claims for ineffective assistance of counsel that were rejected in the state courts. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court has explained that state court determinations of ineffective assistance of counsel are subject to "doubly deferential" review under the AEDPA. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 506 (2003)). *See also Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015) ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks omitted)).

To meet the first, or performance, prong of the test, the record must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Errors that would satisfy this prong include "omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Eze v.*

13

*Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003). "[W]hile in some instances 'even an isolated error' can support an ineffective assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington,* 562 U.S. at 111 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

The second, or prejudice, prong requires the petitioner to establish a "reasonable probability" of a different outcome, *i.e.*, a "probability sufficient to undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. The prejudice prong can be satisfied "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Mr. Baltas contends that trial counsel was ineffective in two ways: (1) counsel admitted Mr. Baltas' guilt during closing; and (2) counsel failed to call witnesses and introduce evidence as to Rock's motive and behavior. ECF No. 48 at 31. In his arguments supporting both examples, Mr. Baltas does not address the first prong of the *Strickland* analysis. Instead, he assumes counsel's performance was deficient and argues that prejudice was evident because there was no overwhelming evidence against him. ECF No. 48 at 31.

In any event, in considering both claims, the state courts applied the *Strickland* standard. Thus, the decisions are not contrary to federal law. The Court considers each claim to determine whether the state courts reasonably applied federal law to the facts.

### 1.  Admission of Guilt

Mr. Baltas first argues that trial counsel was ineffective because she admitted his guilt during closing argument in violation of his Sixth Amendment rights as established under

*McCoy*. To the extent that Mr. Baltas is attempting to reassert his autonomy claim, the claim fails as a court considers counsel's actions at the time of the conduct, not years later. *See Strickland*, 466 U.S. at 690 (a federal habeas court considers the reasonableness of counsel's actions "as of the time of counsel's conduct").

In his state habeas action, Mr. Baltas focused on two specific statements in trial counsel's closing argument to support his claim: "'It's not just [the petitioner] acting alone in this particular case,' and 'you can't be firmly convinced that [the petitioner] acted alone . . . .'" *Baltas*, 210 Conn. App. at 174 n.2. 269 A.3d at 962 n.2. The Connecticut Appellate Court analyzed this claim as follows:

> [D]uring closing argument at [Mr. Baltas'] criminal trial, [Mr. Baltas'] trial counsel argued that [Mr. Baltas] should be found not guilty because there was evidence that he was not the only potential assailant at the crime scene, and because the state had failed to prove beyond a reasonable doubt that [Mr. Baltas], and not the other potential assailant, was responsible for the stabbings. In making this argument, [Mr. Baltas'] trial counsel did concede that [Mr. Baltas] was present at the crime scene. The habeas court concluded, however, that, in making this argument, [Mr. Baltas'] trial counsel did not go so far as to concede [Mr. Baltas'] guilt.

*Id*. at 174, 269 A.3d at 962 (footnotes omitted).

> Specifically, in addressing [Mr. Baltas'] claim of ineffective assistance of counsel., the habeas court explained: "[Mr. Baltas] alleges that defense counsel argued to the jury that there were two participants in the crime without his consent. Said another way, [Mr. Baltas] alleges that defense counsel conceded his guilt to at least some of the charges without consulting with him or obtaining his permission. [Mr. Baltas'] claim is not supported by the evidence ... [T]here was overwhelming identification, physical and circumstantial evidence placing [Mr. Baltas] at the scene of the crime as the masked person.... "Reading the entire closing argument in context, defense counsel did not argue that there were two perpetrators as a concession of [Mr. Baltas'] guilt. Instead ... they were trying to use the overwhelming evidence of [Mr. Baltas'] presence at the scene and the fact that the state had charged and tried the case under the theory that [Mr. Baltas] was the sole perpetrator to their best advantage.... To the extent defense counsel conceded [Mr. Baltas'] presence at the scene, that was a reasonable tactical decision under the circumstances and one that defense counsel ha[d] the authority to make.... Viewing

the entire closing argument in context, defense counsel provided [Mr. Baltas] with competent and vigorous advocacy, despite substantial and overwhelming evidence.... Given the overwhelming evidence, there is also no reasonable probability [Mr. Baltas] would have received a more favorable outcome had defense counsel contested his presence at the scene during oral argument, or simply not mentioned it. Therefore, the claim fails because [Mr. Baltas] had not proven prejudice or deficient performance." (Citations omitted; footnotes omitted).

*Id*. at 174 n.3, 269 A.3d at 962 n.3.

The Connecticut Appellate Court rejected Mr. Baltas' ineffective assistance of counsel claim on the performance prong finding that trial counsel did not concede his guilt during closing argument. Mr. Baltas concedes that he was present in the apartment, albeit allegedly after the attacks occurred.  ECF No. 48 at 27. He contends that trial counsel also conceded that he was a participant in the crime. For support, he refers the Court to the first page of a letter written to him by appellate counsel in which she posits that "the theory of defense at trial was not that you were not present or even a participant, but that Misty was also a participant." Am. Pet. Ex. 3, ECF No. 48 at 49. This letter, which Mr. Baltas does not state was presented to the habeas court considering his ineffective assistance of counsel claim, cannot be considered in assessing the petition. That review is confined to the materials present before the state court.

Petitioner concedes in his reply brief that he was present in the apartment. In light of his presence there, trial counsel conceded that he was present but argued that the evidence showed that Rock, not Mr. Baltas, committed the crimes. *See* Resp't's Mem. Ex. L, ECF No. 54-2 at 68 ("[T]hen he saw Joe go upstairs . . . Misty [Rock] was in the living room when a lot of this commotion was going on, it puts her right in the middle, right in the middle of this incident."). After reviewing the closing argument, the Court concludes that the determination of the

16

Connecticut Appellate Court, that trial counsel did not concede Mr. Baltas' guilt during closing argument, was a reasonable application of federal law to the facts of this case.

Accordingly, Mr. Baltas' petition is denied on this ground.

### 2.  Failure to Call Witnesses and Introduce Evidence

Mr. Baltas asserts a second ineffective assistance of counsel claim based on trial counsel's alleged failure to call witnesses and introduce evidence. The Court, however, previously determined that Mr. Baltas had not exhausted his state court remedies on this claim.[3] *See* Ruling on Motion for Reconsideration, ECF No. 46 at 8 (explaining that the only issues asserted on appeal from the denial of the petition for writ of habeas corpus were the autonomy claim and the related claim of ineffective assistance of counsel). When the Court granted Respondent's motion to dismiss, it afforded Mr. Baltas two options, to return to state court and exhaust his state court remedies for the unexhausted claims or to file an amended petition asserting only the exhausted claims.

Respondent states that, by filing the amended petition, Mr. Baltas expressed his intention to proceed only on the claims for which he has exhausted his state court remedies and argues that the Court should strike this claim. The Court has informed Mr. Baltas that he included an unexhausted claim in his amended petition and afforded him the opportunity to withdraw the unexhausted claim so the Court could review the merits of the remaining claims. The Court

---

[3] To properly exhaust a claim, Mr. Baltas must present the factual and legal bases of the claim to the state courts. *See Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) ("Specifically, [the petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.") (citations omitted); *see also Caballero v. Keane*, 42 F.3d 738, 740-41 (2d Cir. 1994) ("[T]o reach the merits of [an ineffective representation claim], all of [the] allegations must have been presented to the state courts, allowing them the 'opportunity to consider all the circumstances and cumulative effect of the claims as a whole.'") (citation omitted). Thus, for a claim that trial counsel was ineffective, Mr. Baltas must have presented to the state's highest court each example of ineffective assistance that he asserts in the federal habeas petition. *See Caballero*, 42 F.3d at 740.

indicated that refusal to withdraw the unexhausted claim would necessitate dismissing the petition as a mixed petition containing exhausted and unexhausted claims. *See* Order, ECF No. 78. Mr. Baltas has filed a notice expressing his disagreement with the determination that the second ineffective assistance of counsel claim is unexhausted but agreeing to withdraw the claim. *See* ECF No. 79.

Accordingly, this claim is withdrawn, and because this argument, as well as the one discussed above, fail to provide a basis for an ineffective assistance of counsel claim the petition is denied with respect to ground three.

### Ground Four—Prosecutorial Misconduct

"[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a 'heavy burden.'" *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (citation omitted). The federal courts' review of a prosecutorial misconduct claim in a petition for writ of habeas corpus is limited to the narrow issue of whether the alleged misconduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Habeas relief will be granted only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 171 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)); *see also Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (citations and internal quotation marks omitted).

To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483

U.S. 756, 765 (1987) (citation omitted); *see also United States v. Young*, 470 U.S. 1, 11 (1985) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statement or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial."). Thus, the petitioner must show that there is a reasonable probability the identified error affected the outcome of the trial, *i.e.*, that absent the alleged misconduct, the verdict probably would have been different.

For the federal court on habeas review, "the sole issue [is] whether it was objectively unreasonable for the [state appellate court] to find that the [prosecutorial] behavior did not amount to a violation of the petitioner's right to due process." *Joseph v. Kirkpatrick*, No. 20-3615-PR, 2021 WL 4931947, at *1 (2d Cir. Oct. 22, 2021) (quoting *Jackson v. Conway*, 763 F.3d 115, 148 (2d Cir. 2014) (internal quotation marks omitted)); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). The federal court does not "determine whether this behavior was inappropriate, unethical, or even erroneous." *Joseph*, 2021 WL 4931947, at *1. In analyzing the claim, the court considers "the extent to which the trial court cured the prejudicial statements, as well as the weight of the evidence against the petitioner." *Id.* (quoting *Darden*, 477 U.S. at 182) (internal quotation marks omitted).

Mr. Baltas asserts three examples of prosecutorial misconduct in his amended petition, including one example that was not included in the original petition: (1) during closing

argument, the prosecutor misrepresented facts not in evidence by telling the jury that Linda

Laverty made only two changes to her 28-page statement when she made over 100 changes,

failed to acknowledge that the changes were made after he provided Linda Laverty with copies

of the statements of other witnesses, and expressed his opinion as to the credibility of the

witnesses; (2) the prosecutor improperly vouched for the credibility of witnesses; and (3) the

prosecutor improperly used unsubstantiated evidence of allegations of domestic violence. ECF

No. 48 at 33–34.

Mr. Baltas exhausted these claims by asserting claims of prosecutorial misconduct on

direct appeal, namely, introduction of a domestic violence episode between Mr. Baltas and Rock,

allegedly vouching for Rock's credibility when he commented that Rock's lifestyle did not mean

she was not telling the truth, and misstating the number of changes Linda Laverty made to her

statement. *State v. Baltas,* 311 Conn. at 824–26, 91 A.3d at 410–11.

As explained below, the Court concludes that the state court determinations are neither an

unreasonable application of, nor contrary to, clearly established federal law.

Accordingly, federal relief is denied on these claims of prosecutorial misconduct.

### 1.  Witness Credibility

It is well-established that "[a]ttorney statements vouching for the credibility of witnesses

are generally improper because they imply the existence of" evidence not before the jury. *United

States v. Perez,* 144 F.3d 204, 210 (2d Cir. 1998) (quoting *United States v. Rivera,* 22 F.3d 430,

438 (2d Cir. 1994) (brackets omitted)). Vouching by a prosecutor is particularly improper

because it "carries with it the imprimatur of the Government and may induce the jury to trust the

Government's judgment rather than its own view of the evidence." *United States v. Newton,* 369

F.3d 659, 681 (2d Cir. 2004) (quoting *United States v. Young*, 470 U.S. 1, 18–19 (1985)) (internal quotation marks omitted).

Mr. Baltas argues that the prosecutor improperly vouched for the credibility of Rock. His claim is based on the following statement made by the prosecutor during closing argument: "You may not approve of [Rock's] lifestyle, the decisions she has made, her admissions of drug use in the past. And I submit that makes her an easy target. It doesn't mean that she is not telling the truth here two weeks ago," *Baltas*, 311 Conn. at 826, 91 A.3d at 410.

In analyzing this claim, the Connecticut Supreme Court stated, "the prosecutor merely urged the jury not to disbelieve Rock's testimony solely because of her lifestyle. Such a comment does not suggest that the prosecutor may have access to matters not in evidence which the jury may infer to have precipitated the personal opinions[,] which is the evil this rule is designed at preventing." *Id*. at 827, 91 A.3d at 411 (internal quotation marks and ellipses omitted). Although the Connecticut Supreme Court relied on state law, the test applied is the same as required under federal law. Thus, the Connecticut Supreme Court decision finding no impropriety is not contrary to federal law. In addition, the Court finds that the decision is a reasonable application of federal law.

In his reply brief, Mr. Baltas argues what he now claims are other examples of the prosecutor vouching for the credibility of Rock and Linda. In his amended petition, Mr. Baltas listed this claim generally. The Court previously determined that the only example of "prosecutorial vouching" that was exhausted was the example just discussed, *see* Resp't's Mem. App. D, ECF No. 21-4, at 47–51, and construed the amended petition to assert only this example. As noted above, Mr. Baltas cannot amend his petition to add new claims in a memorandum.

21

Accordingly, the Court does not consider these additional arguments, or find any error with respect to the state court's treatment of Mr. Baltas's witness credibility issue as part of his prosecutorial misconduct claim.

### 2. Misrepresentation of Facts

The Connecticut Supreme Court set forth the following facts relating to this incident.

> Specifically, during closing, the prosecutor stated: "[T]he defense came up with and introduced two portions of [Linda's] statement that were inconsistent with what she had said at the time.... She admitted she made these mistakes, she corrected it. And given the fact that ... she had just been released from the hospital, she was concerned about burying her husband, considering what she had gone through, she made two mistakes, which, actually, when you sit down and think about it, separate yourself for a minute, take those two mistakes and look at them, and say, did they really amount to a hill of beans? Did they change the facts here? Does it [now make Rock] the stabber? I don't see it. I don't get it. Two mistakes out of that [twenty-five] page statement." Defense counsel then objected, claiming that the prosecutor had mischaracterized the evidence. The court instructed the jury that its recollection of the facts was to control, and the prosecutor again repeated: "Two mistakes out of that [twenty-five] page statement, is that a bad track record? Does that mean that there is reasonable doubt here?"

*Baltas*, 311 Conn. at 826, 91 A.3d at 410–11.

Mr. Baltas argues that the prosecutor misrepresented facts during closing argument by stating that Linda had made only two changes to her statement when she had made over 100 changes. He contends that the prosecutor mischaracterized the evidence because he knew that Linda had made many changes to her statement. However, this fact was before the jury. During her testimony, Linda described the statement she gave to police as a taped statement that was later transcribed. She stated that she was then given an opportunity to review the transcript and make notations or corrections, which she did. *See* Resp't's Mem. App. K, ECF No. 54-1 at 60–71. The prosecutor asked "isn't it true that there were many areas that you made corrections on?" and Linda agreed that this was true., *Id.* at 103. When defense counsel identified inconsistencies

22

between Linda's testimony and her statement to the police, as opposed to mere corrections on the transcript, the court instructed the jury on inconsistent evidence. *Id.* at 82, 87. In addition, the jury had the copy of the transcript with corrections in the jury room, so they could determine for themselves the number of inconsistencies or corrections. *See* Resp't's Mem. App. K, ECF No. 54-1 at 111 "(It's very hard to listen to when they are saying cross-out, so, again, you will have it in the jury room and you could look at it to see exactly which portions are crossed out or what was added....").

The Supreme Court has noted that "even if the comment is understood as directing the jury's attention to inappropriate considerations [—there, consideration of defendant's motive to exaggerate his emotional disturbance--], that would not establish that [the state court's] rejection of the *Darden* prosecutorial misconduct claim" met the federal standard. *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (explaining that the *Darden* court found no constitutional violation for comments that were much more inflammatory). Indeed, "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Id.* at 48 (citation omitted).

The Connecticut Supreme Court did not consider this reference to two inconsistencies rather than the numerous corrections to the statement to be erroneous and this Court finds the state court's conclusion to be reasonable. In addition, the Connecticut Supreme Court determined that, even if the prosecutor's remarks were improper, the statements would not have prejudiced Mr. Baltas as the state's case against him was "overwhelming." *Baltas*, 311 Conn. at 827, 91 A.3d at 411.

In reviewing the claim, although the Connecticut Supreme Court applied the lesser

23

supervisory powers standard, it considered the weight of the evidence against Mr. Baltas. Thus, the court considered requirements of the federal standard.

Accordingly, the Connecticut Supreme Court's determination that this statement did not warrant exercise of the court's broad supervisory powers, a standard less stringent that the due process standard required under *Darden*, was not an unreasonable application of federal law.

### 3. Domestic Violence

The Connecticut Supreme Court set forth the following facts relating to this incident.

> The trial court permitted the state to introduce evidence of an episode of domestic violence between [Mr. Baltas] and Rock, but only for the limited purpose of proving [Mr. Baltas'] motive or intent to commit the crimes with which he was charged. On cross-examination, Rock was asked by defense counsel if "back-and-forth" physical altercations occurred frequently between [Mr. Baltas] and Rock, and Rock answered affirmatively. On redirect, the prosecutor asked Rock if [Mr. Baltas] hit her frequently, whether she hit him frequently, and whether her physical violence against him would "have the same effect on him as it would you physically?" The prosecutor also asked Rock if [Mr. Baltas] had a temper, and whether she saw evidence of it. In addition, the prosecutor asked whether Rock varies her Oxycodone use depending on how bad her bruises were, and Rock answered in the affirmative, as she had on cross-examination. The prosecutor then pressed further, asking, "[w]hat did you mean by how bad the bruises were?" Defense counsel objected, noting that "[i]t's the same conversation we had at sidebar." The trial court sustained the objection. On recross, Rock answered affirmatively when defense counsel asked whether [Mr. Baltas] would obtain Rock's prescription medication for her and make sure that Rock took it, and generally that [Mr. Baltas] had been trying to help Rock. On further redirect, over defense counsel's objection, the prosecutor displayed to the jury a photograph of Rock following the domestic incident that depicted her with a black eye and asked Rock: "Was he taking care of you when he did this to you...?" During his closing argument, the prosecutor again referenced [Mr. Baltas'] domestic violence against Rock in discussing her credibility and whether she was kidnapped by [Mr. Baltas], even though at least one witness testified that she resisted leaving the apartment with him: "Didn't she do the smart thing" She knew what he was capable of doing. You know what he was capable of doing, you have seen the pictures from the prior occasion."

*Baltas*, 311 Conn. at 824–25, 91 A.3d at 410.

Mr. Baltas argues that the prosecutor improperly introduced evidence of a domestic

violence incident involving Rock and himself.

The Connecticut Supreme Court again concluded that this statement did not warrant exercise of its supervisory powers. In addition to the lack of prejudice, the court stated, "it is clear from the jury's verdict that it did not entirely believe Rock's testimony, as [Mr. Baltas] was acquitted of both counts of kidnapping in the first degree, and a guilty verdict for either of those counts would have required the jury to credit Rock's version of events." *Id.* at 828, 91 A.3d at 411-12.

Accordingly, the Connecticut Supreme Court's analysis of this claim was not an unreasonable application of federal law.

### E.  Ground Five—State Court Errors and Abuse of Discretion

Mr. Baltas lists errors allegedly committed by the trial court, the Connecticut Supreme Court, the habeas court, and the Connecticut Appellate Court.

Mr. Baltas identifies two alleged errors by the trial court: (1) the court gave a misleading jury instruction and (2) the court abused its discretion by refusing to admit into evidence statements of Rock that implicated Rock's guilt or motives. ECF No. 48 at 34.

Mr. Baltas lists two errors by the Connecticut Supreme Court: (1) the court erred when it determined that omitted evidence about Rock's relationship with her stepfather related only to the burglary and kidnapping charges; and (2) erred in denying certification on his habeas appeal. *Id.* at 35.

Mr. Baltas alleges that the state habeas court erred by refusing to apply the *McCoy* standard to Mr. Baltas' autonomy claim and reviewed the claim under the *Strickland* standard. *Id*.

Finally, Mr. Baltas alleges that the Connecticut Appellate Court erred when it found that statements made by trial counsel did not admit Mr. Baltas' guilt and abused its discretion when it affirmed the habeas decision. *Id.*

The Court will address each of these issues in turn.

### 1. Misleading Jury Instruction

Mr. Baltas contends that the trial court gave a misleading jury instruction when it told the jury to view the evidence "in the light most favorable to 'the law.'"  ECF No. 48 at 34.

In fact, the trial court instructed the jury as follows.

> In this case, as in all criminal cases, the defendant is presumed innocent until proven guilty beyond a reasonable doubt. The presumption of innocence was with the defendant when he was first presented for trial in this case, he must be considered free of any bias, or prejudice, or burden arising out of the fact that he has been arrested. This continues with him throughout this trial unless and until such time as all the evidence produced here in the orderly course of the case, and then considered in the light of the instructions of law, and then deliberated upon by you in the jury room satisfies you, as jurors, beyond a reasonable doubt that he is guilty. So the presumption of innocence alone is sufficient to acquit the defendant unless jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all of the evidence and facts in this case.

> If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt the accused is guilty of the crime charged, then it is the sworn duty of the jury to return a verdict of guilty. The burden to prove the defendant guilty of the crime or crimes with which he is charged is upon the state. The defendant does not prove his innocence. This means the State must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged . . . . The State must prove each element necessary to constitute a crime charged. If one element of a crime charged is lacking, you will find the defendant not guilty of the crime.

Resp't's Mem. App. L, ECF No. 54-2 at 138–39. As the trial court did not instruct the jury to construe facts in the light most favorable to the law, there is no factual basis for the claim.

Accordingly, the petition is denied on this claim.

26

### 2. Statements Implicating Rock's Guilt

Mr. Baltas argues that the trial court abused its discretion by refusing to admit into evidence statements implicating Rock's guilt or motives that were made by Rock. The Connecticut Supreme Court determined that the trial court committed reversible error in not admitting this evidence. *Baltas*, 311 Conn. at 803-04, 91 A.3d at 398-99.

Accordingly, Mr. Baltas' claim of error in not admitting this evidence is rendered moot.

### 3. Evidence Relating only to Burglary and Kidnapping Charges

Mr. Baltas argues that the Connecticut Supreme Court erred in determining that evidence about Rock's relationship with her stepfather related only to the burglary and kidnapping charges. The Connecticut Supreme Court considered the applicability of the excluded evidence to the murder and assault charges but determined that, even assuming the exclusion rose to the level of a constitutional violation, the error was harmless.

The Court considers this claim to assert the claim for violation of his rights to present a defense and to confrontation that Mr. Baltas raised on direct appeal. The Connecticut Supreme Court related the following facts and procedural history.

> In early October, 2006, Rock and [Mr. Baltas] had discussed leaving Meriden for South Carolina. At that time, Rock was a drug addict, and [Mr. Baltas] wanted to help her and get away from drugs. On October 6, 2006, [Mr. Baltas] and Rock got into an argument that devolved into a physical altercation, and after [Mr. Baltas] left to get some cigarettes, Rock attempted to commit suicide by overdosing on prescription medication. Rock testified that after the incident, she went back to [Mr. Baltas'] apartment to retrieve her personal effects and moved out.
>
> At trial, the defense sought to portray Rock not as a victim, but as a participant in the crime. When police encountered Rock and [Mr. Baltas] at Pulaski School, Rock told the officers that she had her father's blood on her hands. The defense also noted that, in her original statement to police, Linda placed Rock in the living room during the assault, and that the clothing that Rock was wearing that

evening was consistent with the description that Linda gave of her attacker. The defense also offered forensic evidence, showing that Rock had bloodstained hands, that a ring she wore on her hand had Michael's blood embedded in it, and that she also had bloodstains on her clothing. Finally, the defense provided the testimony of a neighbor who did not think [Mr. Baltas] was using any force to get Rock to accompany him away from the apartment and also pointed to the description provided in the report of a police officer who observed [Mr. Baltas] and Rock walking "[h]olding hands."

The defense also sought to demonstrate that Rock had a motive to participate in these crimes. During an offer of proof outside the presence of the jury, Rock testified that, in the past, she and her stepfather, Michael, did not get along, but she maintained that their relationship had improved in the weeks before his murder. The defense claims that this testimony impeached Rock on her claim that she had been kidnapped by [Mr. Baltas], because it suggested that Rock had a motive to participate in the attack and an incentive to leave with [Mr. Baltas]. The trial court excluded this evidence, finding that the prejudicial impact of Rock's testimony regarding her relationship with Michael outweighed its limited probative value. The court also found that, regarding [Mr. Baltas'] third-party culpability argument, the evidence of Rock's poor relationship with Michael was insufficient to create a direct connection between Rock and the crimes for which [Mr. Baltas] was being prosecuted.

The defense later attempted to introduce evidence through the testimony of Sheila Pappas, a former friend of Rock . . . . Finally, outside the presence of the jury, Pappas testified in an offer of proof for the defense that she had not spoken to Rock for six months prior to the night of October 25, but that she knew that Rock and Michael had a terrible relationship, to the point that Michael would sleep in his car to avoid Rock. Pappas also testified in the offer of proof that Rock had told her that Michael had come into a sum of approximately $35,000, and that Rock and Linda wanted to obtain those funds. Pappas admitted that she had no firsthand knowledge of the status of Rock and Michael's relationship for the six months leading up to the murder, but she did maintain that within that time period Rock had expressed similar sentiments to another friend, Marerro, who told Pappas. The trial court excluded Pappas' testimony on this subject ... concluding that, because Pappas had no firsthand knowledge of the status of Rock's relationship with Michael for the six months leading up to the murder, her testimony on the relationship was neither relevant nor credible.

*Baltas*, 311 Conn. at 793–96, 91 A.3d at 393–94 (footnotes omitted).

On direct appeal, Mr. Baltas challenged the exclusion of this testimony as it related to the relationship between Rock and Michael and financial incentive to obtain money and argued that

28

the exclusion of the testimony violated his rights to present a defense and confront the witness. *See id*. at 796–97, 91 A.3d at 394–95; *see also* Pet'r's Brief on Direct Appeal, ECF No. 21-4 at 25 n.4 ("Defendant does not claim the evidence should have been admitted for third party culpability.").

Whether it derives from the Fourteenth Amendment Due Process Clause or the Sixth Amendment Confrontation Clause, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted). This right, however, is not without limit. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incomplete, privileged, or otherwise inadmissible under standard rules of evidence."). The criminal defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the assessment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992) ("Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' and are not arbitrary or disproportionate to the purpose they are designed to serve.'" (citations omitted)). Whether the exclusion of testimony violated a defendant's right to present a defense depends upon whether, considered in context of the entire record, the omitted evidence "creates a reasonable doubt that did not otherwise exist." *United States v. Augrs*, 427 U.S. 97, 112 (1976).

The Confrontation Clause affords a criminal defendant the "'right to be confronted with the witnesses against him,'" which "has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557 (1988). However,

"the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

In analyzing this claim, the Connecticut Supreme Court acknowledged a criminal defendants' rights to present a complete defense and to confront the witnesses against him. Although the court cited Connecticut cases, those cases set forth the federal requirements of both rights. Thus, the court's decision was not contrary to clearly established federal law.

Whether the exclusion of testimony violated a defendant's right to present a defense depends upon whether, considered in context of the entire record, the omitted evidence "creates a reasonable doubt that did not otherwise exist." *Augrs*, 427 U.S. at 112. Regarding consideration of this evidence as it related to the assault and murder charges, the court explained that Rock was not the key witness for the assault and murder charges; both Linda and Christopher had identified Mr. Baltas as the assailant/murder. In addition, Mr. Baltas admitted being at the residence and the court noted that one knife testing positive with Michael's blood fell out of Mr. Baltas' pocket and the second was dropped along the path Mr. Baltas had traveled after he left the residence. The court concluded that the evidence against Mr. Baltas was strong and Rock's testimony was cumulative to the testimony of the other witnesses. *Baltas*, 311 Conn. at 807-08, 91 A.3d at 400–01.

In making this determination that excluding the testimony was harmless error as related to the murder and assault charges, the Connecticut Supreme Court necessarily determined that the exclusion of this testimony did not create a reasonable doubt that would not otherwise have existed. *See Corby v. Artus*, 699 F.3d 159, 169 (2d Cir. 2012) (because of the deference afforded

30

to state courts on federal habeas review of claims by state prisoners, a federal habeas court will "find an error harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)). Thus, the court applied the correct federal standard. The Court must consider not whether the decision is correct, but whether any reasonable jurist would concur with that determination. *See Brumfield*, 576 U.S. at 314 (if reasonable minds could disagree, federal habeas relief is not available) *and LaBlanc*, 582 U.S. at 94 (even clear error is insufficient to establish an unreasonable application of Supreme Court law).

Accordingly, as Mr. Baltas has not met this standard, federal relief is denied on this ground.

### 4.      Denial of Certification on Habeas Appeal

Mr. Baltas contends that the Connecticut Supreme Court erred by denying certification on his habeas appeal. Certification to appeal a decision of the Connecticut Appellate Court to the Connecticut Supreme Court is discretionary. *See* Conn. Gen. Stat. § 51-197f ("Upon final determination of any appeal by the Appellate Court, there shall be no right of further review . . . .".; thus, the Connecticut Supreme Court is a state court of discretionary review).

Accordingly, as there is no constitutional right to discretionary review, federal relief is denied on this claim.

### 5.      Refusing to Apply *McCoy* Standard

Mr. Baltas argues that the state habeas court erred by failing to apply the *McCoy* standard. As the Court had determined above that *McCoy* does not apply retroactively to cases on collateral review, this claim lacks merit.

Accordingly, federal relief is denied on this claim.

**6.      Statements of Trial Counsel**

Mr. Baltas contends that the Connecticut Appellate Court erred when it found that statements made by trial counsel did not admit Mr. Baltas' guilt and, therefore, abused its discretion when it affirmed the habeas court decision. The Court has determined above that the Connecticut Appellate Court decision on this issue was not an unreasonable application of federal law.

Accordingly, as this claim merely restates that prior claim, relief is denied.

**F.   Ground Six—Accumulated Errors**

In this claim, Mr. Baltas arguesthat the alleged errors committed in this case, considered cumulatively, violated his due process rights and denied him a fair trial. To assert such a claim, Mr. Baltas must show that the Supreme Court has recognized a stand-alone claim of cumulative error. "It is irrelevant that other states or federal courts of appeal may have recognized claims of cumulative error." *Anderson v. Department of Corr.*, No. 3:09-CV-2125(AVC), 2010 WL 5342973, at *9 (D. Conn. Dec. 20, 2010) (citing *Thaler v. Haynes*, 559 U.S. 43, 49 (2010) ("no decision of this Court clearly established the categorical rule upon which the Court of Appeals appears to have relied and we therefore reverse the judgment . . . .")). Mr. Baltas does not identify any Supreme Court case recognizing cumulative error as a stand-alone ground for federal habeas relief and research reveals none.

Other district courts have held that "[i]n limited circumstances, cumulative errors may serve as the basis for habeas corpus relief." *Rivera v. Rich*, No. 9:20-CV-0865(GTS/ATB), 2022 WL 1631938, at *14 (N.D.N.Y. Apr. 4, 2022) (quoting *Brumfield v. Stinson*, 297 F. Supp. 2d

607, 621 (W.D.N.Y. 2003) (internal quotation marks omitted)), *report and recommendation adopted*, 2022 WL 1624696 (N.D.N.Y. May 23, 2022). Before a federal court can find that cumulative errors warrant habeas relief, however, "the alleged individual errors a petitioner seeks to aggregate [must be actual] errors" and the errors must be "so prejudicial that they rendered petitioner's trial ... fundamentally unfair." *Id.* (citations and internal quotation marks omitted).

As the Court has determined that Mr. Baltas has not identified any actual errors, even if this were a right to relief recognized by the Supreme Court, the claim would be denied.

Accordingly, the petition is denied on the sixth ground for relief.

## IV.    CONCLUSION

The amended petition for writ of habeas corpus [**ECF No. 48**] is **DENIED**.

The Court may issue a certificate of appealability only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As Mr. Baltas has not made such a showing with regard to any of his claims, a certificate of appealability will not issue.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at New Haven, Connecticut, this 31st day of May 2024.


  /s/ Victor A. Bolden_____
Victor A. Bolden
United States District Judge